NOT RECOMMENDED FOR PUBLICATION
File Name: 10a0749n.06

06-4329

FILED
**Dec 02, 2010**
LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| EUGENE WOODARD, | ) | |
| | ) | |
|    Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| BETTY MITCHELL, Warden, | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
|    Respondent-Appellant. | ) | |

Before: MERRITT, DAUGHTREY, and MOORE, Circuit Judges.

Martha Craig Daughtrey, Circuit Judge. In this capital case, Warden Betty Mitchell appeals a conditional grant of habeas relief to petitioner Eugene Woodard, a prison inmate on Ohio's death row, pursuant to 28 U.S.C. § 2254. The district court's order was premised on its finding that trial counsel rendered ineffective assistance in the penalty phase of Woodard's state court trial by failing to investigate and present relevant mitigating evidence, after the jury found Woodard guilty of aggravated murder in the commission of what was essentially a car-jacking. The respondent contends, first, that there is insufficient proof upon which to find that counsel's performance was deficient and, second, that any additional evidence of the petitioner's "familial and social history" could not have established prejudice, because it was "not of a different strength and character" from the mitigating evidence offered by Woodard's attorneys. The respondent thus argues that the

petitioner has failed to meet the well-recognized two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), and urges us to reverse the judgment of the district court. We, on the other hand, conclude that the district court did not err in granting conditional relief in this case, and we therefore affirm the judgment of that court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Woodard was charged in a six-count indictment with premeditated murder and felony murder in the death of Mani Akram. Both the aggravated-murder counts carried death-penalty specifications under Ohio law. He was also charged with aggravated robbery, receiving stolen property, and two counts of arson, each with a firearm specification. Following a week-long trial, Woodard was convicted by a jury of all charges except arson.

Evidence at trial established that Woodard and three of his friends joined some other young men in an inner-city neighborhood in Cleveland in June 1990 to go "gaffling." According to the statement of fact set out by the Ohio Supreme Court, "'gaffling' is a term used to describe the act of forcibly removing people from their cars to rob them." *State v. Woodard*, 623 N.E.2d 75, 76 (1993). The first intended victim they accosted managed to outrun the assailants' car, which was itself a stolen vehicle that overheated as a result of the chase. The gang then abandoned that car, stole another one from a nearby parking lot, and went after their second intended victim, Mani Akram. The ensuing car-jacking was accomplished at the cost of Akram's life – he was shot and then left for dead in the street

after Woodard and the other perpetrators took possession of his car and drove away. Later that same evening, the petitioner and other members of the group doused both stolen vehicles with gasoline and set them on fire. At Woodard's trial, one of his accomplices, Gary Hill, testified that Woodard was the shooter and that Woodard claimed entitlement to Akram's car, saying that he was "the one who shot the guy." The jury came to the same conclusion and convicted Woodard on multiple counts.

At the sentencing hearing that took place a week after the jury returned its verdict, defense counsel called only two witnesses: the petitioner's mother, Marsha Woodard, and his sister, Tonya Woodard. On direct examination totaling just ten pages of transcript, they testified that Woodard was a good son and loving brother and, as directed by counsel, they both pleaded with the jury not to impose the death penalty. Woodard then made an unsworn statement, in which he gave a less-than-coherent account of the events leading up to Akram's death, denying his own guilt and telling the jury that it was Gary Hill who had fired the fatal shot. The state presented no evidence. Although the transcript of the hearing does not record the time that the hearing began, it appears to have lasted less than an hour.

Woodard was 19 years old at the time of Akram's death and at the trial some four months later. Despite his age and the relatively unexceptional circumstances of the offense that led to his conviction, the jury recommended imposition of the death penalty, and the trial judge accepted the recommendation, sentencing Woodard to death for the

aggravated murder counts and to various terms on the other felony counts. Woodard's conviction was affirmed by the state court of appeals, *see State v. Woodard*, No. 611 71, 1992 WL 84888, *11 (Ohio Ct. App. Apr. 23, 1992), and by the Ohio Supreme Court. *See Woodard*, 623 N.E.2d at 82. His subsequent *certiorari* petition was denied by the United States Supreme Court. *See Woodard v. Ohio*, 512 U.S. 1246 (1994). Woodard then filed a petition for post-conviction relief that was dismissed in state court, *see State v. Woodard*, No. CR-254478, slip op. (Ohio Ct. Com. Pleas Dec. 9, 1996), in an order that was affirmed by the Ohio Court of Appeals. *See State v. Woodard*, No. 71912, 1998 WL 23844 (Ohio Ct. App. Jan. 22, 1998). The Ohio Supreme Court denied review in 1998. *See State v. Woodard*, 692 N.E.2d 1024 (Ohio 1998). That same year Woodard also filed a petition for habeas relief in federal court but returned to state court temporarily in order to exhaust his state remedies before federal litigation began. There he sought to reopen his direct appeal in order to allege that his attorneys were ineffective, supporting his claim with affidavits and seeking an evidentiary hearing. That application was denied by the Ohio Court of Appeals, which held that the claim was barred by *res judicata* because it had not been raised on direct appeal. *See State v.Woodard*, No. 61171, 2001 WL 1134873 (Ohio Ct. App. Sept. 18, 2001). Although this conclusion was, in fact, erroneous because the evidence to support Woodard's allegations of ineffective assistance of counsel was outside the record on direct appeal, the Ohio Supreme Court nevertheless affirmed the Court of Appeals. *See State v. Woodard*, 774 N.E.2d 1213 (Ohio 2002). At that point, Woodard resumed his federal litigation, filing an amended petition that included 31 grounds for relief, all but

two of which the district court dismissed without an evidentiary hearing, either on the merits or as procedurally defaulted in state court. The district court determined that a hearing was necessary in order to rule on the remaining two grounds, which alleged ineffective assistance of counsel in the penalty phase of the petitioner's trial. The court also granted discovery motions filed by both parties.

During discovery, counsel for the state insisted that the petitioner's witnesses be deposed, claiming that the court would not be able to assess their credibility solely from affidavits that had already been filed in the case. As a result, the petitioner deposed several members of his family, two mitigation experts, and a psychologist. These depositions and affidavits were entered in the record, but the district court also heard live testimony from the petitioner's witnesses at the ensuing evidentiary hearing. The state did not subpoena or call any witnesses.

Based on testimony by Woodard, three of his family members, and three expert witnesses, the district court found that trial counsel had failed to investigate Woodard's family history and social history adequately, thereby losing any opportunity to present relevant information at the penalty hearing in state court. Although Woodard's trial attorneys did procure some of his school and juvenile-court records in advance of trial, they did not use them, either as exhibits or, more significantly, as the basis for further investigation. Moreover, they assigned the state-paid investigator to assist in preparation for the culpability phase of the trial, but did not direct him to investigate grounds for

mitigation in the event of conviction. During the week between the return of the jury's verdict and the sentencing hearing, counsel did contact a clinical psychologist, Dr. Sandra McPherson, but she declined to evaluate Woodard because there was insufficient time for her to do a thorough investigation and issue a report. She later recalled spending only about an hour on the case, principally in speaking to the petitioner's mother, and did not open a file on the case, prepare a report, or testify at trial.

The district court concluded that these meager efforts – a "cursory request for some court and school records" and an "eleventh-hour attempt to contact a psychologist" – constituted the only preparation undertaken by counsel in preparation for the penalty hearing. The district judge further concluded that there had been no actual investigation carried out by trial counsel or by anyone else acting on Woodard's behalf. Instead, the district court concluded, counsel's penalty-phase strategy was limited to having Woodard's mother and sister plead for mercy, presenting Woodard's unsworn statement, and arguing a theory of residual doubt that Woodard was not the triggerman, despite the jury's verdict to the contrary.

Following the evidentiary hearing, the district court issued a well-analyzed and thoroughly detailed opinion that culminated in a finding that the petitioner had been "afforded . . . constitutionally deficient assistance of counsel" at his penalty hearing in state court. The district court held that, in view of the evidence that was presented at the hearing in federal court – specific portions of which are discussed below – counsel's pre-hearing

investigation and preparation was not only deficient but also resulted in prejudice to their client. As a result, the state was given 180 days to vacate the petitioner's death sentence and either impose a life sentence in its place or conduct a new sentencing hearing. From that conditional grant of relief, the state now appeals.

## II.  DISCUSSION

### A.  Standard of Review

Because Woodard filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the standards set out in that statute govern our review. *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). We review the district court's rulings on legal questions and on mixed questions of law and fact *de novo*, and the court's factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). Ordinarily, we would not affirm a grant of habeas relief on any claim that had been adjudicated on the merits in state court unless the adjudication had resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006) (citing 28 U.S.C. § 2254(d)), *cert. denied*, 551 U.S. 1134 (2007).

However, AEDPA is, by its own terms, applicable only to habeas claims that were "adjudicated on the merits in State court." 28 U.S.C. § 2254(d). Hence, in reviewing the merits of federal constitutional claims that were not resolved by the state courts, we apply pre-AEDPA law and review questions of law and mixed questions of law and the facts *de novo*. See *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003). In this case, the Ohio Court of Appeals, the last state court to review the petitioner's ineffective-assistance-of-counsel claims, did not reach the merits of those claims, instead concluding – mistakenly, as the state now concedes – that they were barred by *res judicata*. For this reason, there is no definitive ruling by the state court on the precise legal issues now before us, and we therefore review them *de novo*. Moreover, there are no dispositive findings of fact from the state court that must be presumed to be correct, as would otherwise be the case under 28 U.S.C. § 2254(e)(1).

**B. Legal Standard**

To establish ineffective assistance under the well-entrenched two-part *Strickland* analysis, Woodard must show (1) that trial counsel's performance was deficient – objectively unreasonable under prevailing professional norms – and (2) that it prejudiced Woodard's defense. *See Strickland,* 466 U.S. at 687-88. The test for prejudice is whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *See id.* at 694. "A reasonable probability is

a probability sufficient to undermine confidence in the outcome," *id.*, but is less than a preponderance of the evidence. *Id.* at 693-94.

## C. Ineffective Assistance of Trial Counsel

The district court determined that counsel's representation at the penalty phase of Woodard's trial was not only deficient but prejudicially so. On appeal, the state contends that the district court erred in granting relief on Woodard's two ineffective-assistance-of-counsel claims. In those claims, Woodard alleged that trial counsel were ineffective in the penalty phase in failing to use expert psychological assistance and failing to hire a mitigation expert and, by extension, in failing themselves to investigate and present mitigating evidence. Combining the claims, the district court interpreted them to propound a single argument: that trial counsel rendered ineffective assistance by failing to investigate and present evidence of Woodard's family background, upbringing, and mental condition. On appeal, the parties also have combined the claims for analysis, as do we for purposes of this opinion.

## 1. Ineffective Assistance: Performance

The district court summarized the evidence from the transcript of the petitioner's sentencing hearing in state court as follows:

> During the mitigation hearing, counsel presented only the testimony of
> Marsha and Tonya Woodard, Woodard's mother and sister, and Woodard's

own unsworn statement. Woodard's mother and sister testified that Woodard was a good son and brother and that he deserved mercy. Woodard expressed remorse for Akram's death, but asserted that he was not Akram's shooter.

It also became clear from testimony in federal court that trial counsel had not interviewed Woodard or members of his family prior to trial in preparation for the penalty hearing that would inevitably follow his conviction on the aggravated murder charge. Woodard's mother had been present throughout his trial but told the district court that she was not interviewed by his counsel until the morning of the penalty hearing, a week after the jury verdict was returned, when she met with the attorneys for a short while in a witness room and was advised to plead for her son's life. Likewise, his sister testified that she met with counsel in the hall of the courthouse shortly before being called as a witness and was told to "plead and beg" for her brother's life. Woodard testified that his lawyers had discussed mitigation with him only after he was convicted, in a meeting that lasted about 20 minutes. He said that he had given counsel the names and contact information for other members of his family and friends who could be called as witnesses, but he also indicated that he had not been asked about his personal history or that of his family. Instead, he testified, they told him to "get up there and beg for your life and say you're healed."

Reviewing this evidence, the district court held that counsel's investigation and preparation for the mitigation phase of Woodard's trial was objectively unreasonable. On appeal, the respondent challenges the district court's decision on three grounds, contending: (1) that Woodard failed to show that counsel's investigation was unreasonable,

because he cannot establish the full extent of that investigation; (2) that trial counsel's failure to present additional evidence was not unreasonable, because the sources for it were unavailable at trial; and (3) that Woodard failed to show that trial counsel's residual-doubt strategy was unreasonable, given the risk that introduction of additional evidence would have opened the door damaging information about Woodard. We find no merit to these arguments.

As to the first ground, the state contends – correctly – that in order to establish the professional unreasonableness of counsel's investigation, Woodard bears the burden of documenting "either through the [case file] or statements from trial counsel what they did to investigate the case and why they pursued that strategy." The state then argues – incorrectly – that Woodard cannot sustain that burden because, during litigation in state court, "he submitted no affidavits from his trial attorneys concerning the extent of their investigation." Moreover, the state accuses the petitioner of gaining an unfair advantage because both attorneys had died by the time of the evidentiary hearing in district court and, therefore, could not "defend themselves against claims that they did not talk to family members or investigate Woodard's social history." The respondent further contends that "since Woodard had [an] opportunity in the state court to produce an affidavit from counsel on the extent of their investigation, that failure should cut against Woodard's claim."

In support of this argument, the respondent cites three opinions of this court, *Carter v. Mitchell*, 443 F.3d 517, 531 (6th Cir. 2006), *cert. denied*, 507 U.S. 938 (2007); *Mason*

*v. Mitchell*, 320 F.3d 604, 620-21 (6th Cir. 2003); and *Martin v. Mitchell*, 280 F.3d 594, 615 (6th Cir. 2002). None of the three cases, however, *requires* that evidence of the investigation of trial counsel come from their statements or their case files, however preferable those sources might be. It is true that in the most recent of the three, *Carter*, we observed that "curiously absent from the record is any statement from trial counsel describing what he did or did not do in investigating Carter's background. By not detailing trial counsel's efforts to learn of Carter's background, Carter has provided no basis for a finding that trial counsel's investigation was unreasonable." *Carter*, 443 F.3d at 531. But, in that opinion we also noted that "there [we]re no allegations that counsel did not contact the four family members" who had useful information to offer, in contrast to three family members with little useful information who had signed affidavits stating that they were never contacted by trial counsel. *Id.* at 530-31. Thus, Carter failed to provide information from *any* relevant source (either relatives with important knowledge or trial counsel) detailing trial counsel's efforts to learn of Carter's background.

It is also true that *Mason* includes our suggestion that "in order for us to evaluate whether defense counsel rendered constitutionally ineffective assistance at sentencing, we must know more about the extent of counsel's investigation and preparation of mitigating evidence." *Mason*, 320 F.3d at 620. But there we remanded the case for an evidentiary hearing "[b]ecause the record as it now stands reflects disputes about defense counsel's performance with respect to the sentencing phase of Mason's trial." *Id.* at 620-21. The record in this case reflects no such dispute. And although the remand in *Mason* was

presumably ordered so that trial counsel could testify, the ruling stands merely for the obvious: that such testimony, when available, is preferred. *Mason* does not hold, as a categorical matter, that testimony from trial counsel or evidence from counsel's case file is a condition precedent to a grant of habeas relief on a claim of ineffective assistance.

The final case cited, *Martin*, is simply not on point. In state court, Martin had failed to develop the factual basis for his claim that trial counsel had rendered ineffective assistance in the penalty phase of Martin's trial. Because Martin had not contacted trial counsel and developed a factual record concerning his allegedly deficient representation during post-conviction proceedings in state court, we held that he was not entitled to an evidentiary hearing in the district court, based on 28 U.S.C. § 2254(e)(A)(ii). *See Martin*, 280 F.3d at 615. Here, by contrast, Woodard presented a factual basis for his claim in state court. As petitioner, he does have the burden of establishing that trial counsel's investigation was deficient. *See Strickland,* 466 U.S. at 687-88. But *Martin* does not prohibit a defendant from meeting this burden by means of sources other than trial counsel's statements or case file.

The state next argues, as to the second ground, that trial counsel's failure to present the "new mitigating evidence" was not unreasonable because the main sources for that evidence – the two male figures in Woodard's childhood – were unavailable at trial. Leo Clayton, Woodard's father, was involved along with his brother (Woodard's uncle) in a drug-trafficking operation in Cleveland and was in prison for the first seven years of his

son's life. Out of prison, Clayton used Woodard as a drug courier as early as age eight, sending him unaccompanied on a plane to Chicago on at least one occasion to deliver or pick up contraband. When Clayton's own addiction to narcotics disabled him, Woodard attempted to operate his father's drug-trafficking business for him at age 12 or 13. Meanwhile, Woodard's mother had begun living with another man, Alonzo Eberhardt, who physically assaulted Marsha Woodard in front of her son and eventually went to prison for shooting her. As the state points out, neither of the two men testified at trial.

The state contends that Clayton would not have testified in any event, because he was "hiding from the law" at the time of trial. The state further argues that the petitioner has failed to establish that trial counsel would have been able to contact Clayton, noting testimony that neither Woodard or his mother knew Clayton's exact whereabouts at that time. The state contends that there is, likewise, no reason to believe that Eberhardt would have testified at trial and that Marsha Woodard herself offered no testimony about abuse at the hands of Eberhardt either at the trial or in the evidentiary hearing in district court. We conclude that the record establishes otherwise.

Leo Clayton testified in the federal evidentiary hearing and admitted that, at the time of his son's trial, there had been an outstanding warrant for his arrest. He said that he had not attended the trial for that reason, but he contended that he was in Cleveland during the trial and that – although never contacted by trial counsel – he did speak by telephone with his son and with Marsha and Tonya Woodard about the ongoing trial. Clayton also

indicated that the outstanding warrant was actually for a relatively minor charge, and he was adamant that, if asked to testify at the sentencing hearing, he "[m]ost definitely . . . would have stepped forward."

The state argues that "this late-in-the-day bravery rings hollow" and questions not only whether Clayton would have been willing to risk jail for his son but also whether trial counsel could have contacted Clayton had they tried. One of their potential sources for such information, Marsha Woodard, testified at trial that, as far as she knew, Clayton was in the Cleveland area but that she had not seen him, which might be taken to imply that she did not know how to contact him. In the federal hearing, however, she testified that at the time of trial, she could have told trial counsel how to contact him. Woodard also made inconsistent statements, telling a probation officer at the time of trial that he did not know where Clayton was, but testifying in the federal hearing that he had could have contacted his father if asked to do so by trial counsel.

The respondent's skepticism notwithstanding, we conclude that in holding that trial counsel were ineffective for not presenting this evidence in mitigation, the district court necessarily found credible the witnesses who testified that the information could have been uncovered and presented at trial. Moreover, despite the state's conjecture, we find just as plausible the possibility that Clayton's family was able to contact him but was also reluctant to tell law enforcement officials where he could be found at the time of trial. In any event,

the state has not shown the district court's factual determinations regarding Clayton's testimony are clearly erroneous.

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985).

As with Clayton's testimony, the state contends that evidence of Alonzo Eberhardt's abuse of the petitioner's mother was unavailable at the time of trial or, alternatively, that the petitioner has not shown it to have been available, citing the lack of any testimony from Eberhardt himself, as well as the fact that the victim of the alleged abuse – Marsha Woodard – did not testify about it at trial. The state also argues that there is no documentation in the record confirming such abuse, "only a reference by Dr. Pearson during the post-conviction proceedings that [Eberhardt] was a known 'batterer' who sometimes pulled a gun on Woodard's mother in front of [Woodard]." But the state also concedes that at the federal evidentiary hearing, Marsha Woodard testified that she stood by the statements in the affidavit that she had signed in connection with the post-conviction litigation in state court, thereby effectively incorporating them by reference into her testimony in federal court. In that affidavit she described the abuse she suffered at Eberhardt's hands. Although it might have strengthened the record from the fact-finder's point of view if Marsha Woodard had reiterated the details of Eberhardt's conduct during

her testimony, the district court apparently found that live testimony from this witness was sufficient to establish her credibility and, by extension, concluded that the allegations in her affidavit were also credible.

Moreover, there was another eyewitness to the domestic abuse not mentioned by the state: Woodard's sister, Tonya. At the federal hearing, she reaffirmed the information in her post-conviction affidavit, in which she had described the relationship between her mother and Alonzo Eberhardt, who was Tonya's father. As a result, the record contains two sources for this evidence that were available at the trial in state court, and those two sources were, in fact, witnesses at the penalty hearing in state court. Counsel simply did not ask either of them the right questions, which may have been due to the absence of an investigation into their client's background that would have informed them of this family history. It is difficult, if not impossible, to conceive that the lack of relevant questioning was the result of intentional strategy on the part of the petitioner's counsel.

In its third argument concerning trial counsel's performance, the state argues that the petitioner has failed to show that his attorneys' residual-doubt strategy was unreasonable in light of the risk that introduction of the new mitigating evidence would have allowed the jury to learn damaging information about Woodard. While "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Strickland*, 466 U.S. at 690, strategic choices made after less than complete investigation are open to serious challenge. They are "reasonable precisely to

the extent that reasonable professional judgments support the limitations on investigation."

*Id.* at 691.

> In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.*

As the district court found, trial counsel's strategy, if it can be called that, was virtually wholly uninformed and was, therefore, unreasonable. Except for the cursory request for court and school records and counsel's eleventh-hour attempt to contact a psychologist, there is nothing in the record to suggest that either of Woodard's trial attorneys even attempted to investigate his background in preparation for sentencing. Such representation is, as a legal matter, deficient. *See Wiggins v. Smith*, 539 U.S. 510, 524-28 (2003) (holding that when counsel abandons investigation into the client's background after having acquired only rudimentary knowledge from a narrow set of sources, neither the choice nor the investigation is reasonable under *Strickland*). Hence, because the follow-up step – the choice to opt for a residual-doubt strategy – was uninformed, it was also professionally unreasonable. See *Williams v. Anderson*, 460 F.3d 789, 804 (6th Cir. 2006).

## 2. Ineffective Assistance: Prejudice

"[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way — in strength and subject matter — from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005). In this case, the state challenges the district court's determination that the petitioner was prejudiced by counsel's deficient performance, characterizing the evidence both as "tenuous" because of its indirect sources and as "too weak to establish actual prejudice." The state also insists that the mitigating evidence offered at the evidentiary hearing in federal court, if produced by Woodard at the original trial, would have risked introduction by the prosecution of damaging rebuttal evidence. Despite this speculation, we agree with the district court's finding that the evidence adduced at the federal hearing established a clear case of prejudice to the petitioner, resulting from the failure of his attorneys to uncover what was reasonably available information about Woodard's background.

The new mitigating evidence differed substantially in scope and substance from the meager testimony presented at the sentencing phase of Woodard's trial, through which the jury learned only that Woodard was born to a single mother whose sole income was from welfare and grew up in a housing project; that his father was in prison until Woodard was eight years old; that he had a good relationship with his sister; and that he dropped out of high school before graduation. Because there was nothing of a truly mitigative nature about that testimony, it is obvious that trial counsel were focused merely on attempting to

arouse the jury's sympathy through pleas for leniency by the petitioner's mother and sister, in addition to presenting Woodard's obviously ineffectual, unsworn statement to the jury in an ill-conceived effort to create residual doubt about his guilt.

By contrast, at the evidentiary hearing in federal court, counsel for the petitioner presented the testimony of three family members (the petitioner's mother, father, and sister) and the petitioner himself, as well as three expert witnesses (Dr. Sharon Pearson, Charles See, and Dr. Sandra McPherson). The evidence they provided painted a far different picture of the teen-aged Woodard than the one the jury saw at trial. The new proof revealed not just a disadvantaged childhood, but also entanglement with crime from a very early age. Combined with serious psychological problems, this social history set Woodard on a path to personal disaster, culminating in his senseless shooting of Mani Akram. Although it seems virtually certain that the new mitigation evidence would not have convinced even one juror that Woodard was innocent. *i.e.*, that someone else in the gaffling gang was actually the triggerman, it is equally clear that available evidence about the petitioner's background and psychological make-up might well have changed at least one juror's mind about the propriety of imposing the death penalty.

For example, Dr. Pearson, a clinical psychologist, testified that she had interviewed and tested the petitioner in order to evaluate his "background and psychosocial history." In doing so, she reviewed various documents, including Woodard's school, health, and juvenile court records. She concluded, among other things, that he suffered from

undiagnosed and untreated attention deficit hyperactivity disorder, which manifested itself in behaviors such as anger, aggression, and poor impulse control. Such "[i]mpulsivity," she said in an affidavit filed as an exhibit in federal court, "often leads to accidents and engagement in potentially dangerous activities without consideration of possible consequences." Dr. Pearson also noted that:

> Eugene is a product of his dysfunctional family of origin, growing up in the projects, unhealthy role modeling, unavailability of reasonably attainable, socially acceptable goals, exposure to repeated violence, destruction and loss, and probable congenital difficulties – low birth weight, Attention Deficit/Hyperactivity Disorder, fetal distress, Cytomegalovirus exposure.

The "unhealthy role modeling" was provided, first and foremost, by Leo Clayton, Woodard's biological father, who was imprisoned for much of his son's childhood and who never married his mother. Dr. Pearson reported that following Clayton's release from prison:

> Leo quickly put Eugene to work in Leo's drug business as he believed no one would suspect an 8 year old. Eugene was flown back and forth between Chicago and Cleveland picking up drugs from Leo's suppliers; he also was expected to deliver drugs and collect payment in the neighborhood. By the age of 12 or 13, he was running Leo's business attempting to keep from collapsing secondary to Leo's own increasing drug use. Leo reports intentionally teaching his son to hustle as a way to make a living. He denies teaching him to earn a living legitimately. While Leo worked in his earlier years, the streets soon provided him an income. Eugene later stopped contact with Leo secondary to Leo's drug use.

Based on the petitioner's experience as a juvenile drug-courier for his father, Dr. Pearson found that "Eugene learned very early to take responsibility for the actions of others, to

keep his mouth shut, to behave loyally even when loyalty was not deserved. He had to learn to ignore or deny fears or concerns in order to please his father."

The second role model was, of course, Alonzo Eberhardt, who also was never married to Woodard's mother but who lived with her for many years and whom Woodard called "Dad." Dr. Pearson reported that Eberhardt "attempted to befriend [Woodard] and parent him [but] at the same time was violent with his mother . . . [and] eventually was imprisoned for shooting [her]." According to Marsha Woodard, Eberhardt "tried to be a father-figure to Eugene," but she also said that Eberhardt "oftentimes pulled a gun on me," sometimes in front of the petitioner.

Another expert witness, Charles See, was the director and co-founder of the Community Re-entry Program, which aided individuals newly released from prison. He testified as a cultural expert to his familiarity with the Cleveland urban community in which Woodard grew up, as well as from his knowledge of the Woodard family. See said that Woodard came from a family that on his father's side was locally notorious for involvement in crime and various illegal activities and that Leo Clayton had involved the petitioner in trafficking drugs at a young age. The resulting impact on Woodard, he testified, was that although "he struggled to develop some sort of identity independent from that of his family, he found that almost impossible, being constantly reminded of who he was, being constantly invited to join various youth gangs, and also unfortunately being given drugs by his father [and] using drugs with his father." In addition, See said that Alonzo Eberhardt

"was a reputed underworld figure himself . . . . So between the reputation of Leo Clayton and Alonzo Eberhard[t], Eugene f[ound] himself involved with two men who were notoriously reputed in that community." See also said that, to the best of his knowledge, all the information on which he based his testimony was available at the time of Woodard's trial in 1990.

Dr. McPherson was the clinical psychologist who had not been contacted by petitioner's trial attorneys until after the jury had returned a guilty verdict and who was therefore unable to evaluate and file a report on their client in time for the sentencing hearing. She noted that there was undoubtedly sufficient evidence available on which to base an evaluation at that time but, with no opportunity to gather and analyze it, she had been forced to decline to take on the case.

In response, the state argues that this newly presented evidence, in and of itself, is not particularly powerful, because the evidentiary support for it is "tenuous, coming from a collateral source instead of the primary actors." We reject this view of the proof.

It is true, as the state points out, that Alonzo Eberhardt himself never testified, by affidavit, deposition, or in person. But he was not the only available source for information about the domestic abuse that marked Woodard's childhood, given that both Marsha Woodard and Eberhardt's daughter, Tonya Woodard, could have provided that information to the jury. And, contrary to the state's contention, Dr. Pearson's affidavit was not the sole source for the information about Woodard's early involvement in his father's drug business.

Clayton, in an affidavit filed as part of the state post-conviction litigation, admitted that he began using Woodard to run drugs when he was eight years old and that, when the boy was 12, Clayton used him to pick up contraband from an out-of-state supplier. At the subsequent federal hearing, Clayton affirmed as true all the statements in his affidavit. He did not testify concerning the statement in Dr. Pearson's affidavit that, at age 12 or 13, Woodard took it upon himself to run his drug-trafficking business in an attempt to keep it from collapsing due to Clayton's increasing drug use. But this information also has a direct source: Woodard himself testified at the federal hearing that the family history given in Dr. Pearson's affidavit was accurate.

The state next argues that the district court made no credibility findings regarding the information contained in affidavits and merely adopted by reference in the federal hearing. We disagree here, as well. By holding that trial counsel were ineffective in not presenting this mitigating evidence, the district court was necessarily finding credible the witnesses in support of that evidence. Moreover, that determination is not clearly erroneous.

The state concedes that the new mitigating evidence is substantially different in subject matter from that presented at trial, but denies that the new mitigating evidence is substantially stronger. As indicated in the discussion set out above, the proof offered at the penalty phase of Woodard's trial consisted of "[his] mother and sister testif[ying] that Woodard was a good son and brother and that he deserved mercy." Woodard made an

unsworn statement in which he expressed remorse for the victim's death, but denied that he was the shooter. That was the extent of the evidence offered in mitigation. It stands in stark contrast to the core theme of the new mitigating evidence: the effect on Woodard of having a father who involved him in drug sales when he was still a child and a father figure who subjected Woodard's mother to physical abuse in Woodard's presence. It would be difficult, if not impossible, to conclude that this evidence was not substantially stronger than that presented at trial. It is no misstep to conclude in addition that if this evidence had been presented at trial, there is a reasonable probability at least one juror would have had a reasonable doubt that death was the appropriate penalty.

Nor do we believe, as the state now contends, that the new evidence, if presented to the jury, would have run the risk of opening the door to a barrage of damaging rebuttal evidence about Woodard. In Ohio, at the time of Woodard's trial, the prosecutor's use of rebuttal evidence in the penalty phase was governed by this rule:

> The prosecutor, in the penalty stage of a capital trial, may rebut false or incomplete statements regarding the defendant's criminal record. This right is limited, however, to those instances where the defense offers a specific assertion, by a mitigation witness or by the defendant, that misrepresents the defendant's prior criminal history.

*State v. DePew*, 528 N.E.2d 542, syl. ¶ 3 (Ohio 1988). Based on *DePew*, the district court rejected the Warden's argument: "Had defense counsel merely presented the testimony regarding Woodard's relationships with Clayton and Eberhardt in the context of presenting Woodard's family background, there is a substantial likelihood that any rebuttal evidence

regarding Woodard's character would not have been admissible during trial." On appeal, the state has presented no reason to believe the other-acts evidence would have been admissible. Indeed, although framed as "rebuttal," it is difficult to grasp just what rebuttal would achieve. Evidence that Woodard had previously committed various juvenile crimes would seem consistent with the theme of the new mitigating evidence, *i.e.*, that he had been raised in a family environment in which crime was seen as a way of life, not a rebuttal of it.

## III. CONCLUSION

For the reasons set out above, we conclude that the district court did not err in ruling that petitioner Woodard received ineffective assistance of counsel in the penalty phase of his state trial. We therefore AFFIRM the judgment of the district court and REMAND the case for issuance of a conditional writ of habeas corpus directed to the state court.