RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0290p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

BILLY JOE SOWELL,
            *Petitioner-Appellee/Cross-Appellant,*


            *v.*

CARL ANDERSON, Warden, Mansfield
Correctional Institution,
            *Respondent-Appellant/Cross-Appellee.*

Nos. 08-3522/3575

>

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 94-00237—Edmund A. Sargus, Jr., District Judge.

Argued: October 13, 2010

Decided and Filed: November 15, 2011

Before: BATCHELDER, Chief Judge; MOORE and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Robert E. Prather, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Mark A. Vander Laan, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Robert E. Prather, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Mark A. Vander Laan, DINSMORE & SHOHL LLP, Cincinnati, Ohio, Randall L. Porter, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellee.

        ROGERS, J., delivered the opinion of the court, in which MOORE, J., joined. BATCHELDER, C. J. (pp. 26–32), delivered a separate opinion concurring in part and dissenting in part.

1

––––––––––––––––

**OPINION**

––––––––––––––––

ROGERS, Circuit Judge.  Billy Joe Sowell was convicted of aggravated murder and sentenced to death by a three-judge panel in 1983.  At sentencing, counsel's mitigation strategy was to portray Sowell as a good person who lost his temper under the influence of drugs and alcohol.  Counsel pursued this strategy despite having available the reports of several court-appointed mental health experts, which hinted at Sowell's difficult upbringing but did not provide specific details about his severely impoverished and abusive childhood.  Despite these reports, counsel did not conduct an investigation into Sowell's background or interview any of his family members.  Had they done so, there is a reasonable probability that the additional mitigating evidence would have led at least one of the panel judges to vote against the death penalty.  The district court therefore properly granted habeas relief on this basis.

I.

The facts underlying Sowell's conviction are not in dispute.  As we did in our initial review of Sowell's petition, we rely on the Ohio Court of Appeals' version of the facts:

> The record discloses that [Sowell] and [Calvert] Graham resided in adjacent apartments on the third floor of an apartment building in downtown Cincinnati.  [Sowell] was the resident manager of the building and became acquainted with Graham, who performed occasional odd jobs at the apartment building.  After Graham became a resident in [Sowell's] apartment building, the two men developed a friendly relationship and visited one another in their respective residences.

> On May 1, 1983, three days prior to the instant offenses, [Sowell] was a guest in Graham's apartment.  Also present were Donna Edwards (Edwards), a woman with whom Graham shared the apartment, and [Pam] Billups [a former prostitute who had been visiting Graham and Edwards].  Graham offered two marijuana cigarettes to [Sowell], which he accepted.  Thereafter [Sowell] left the apartment in the company of Billups and proceeded to a nearby restaurant where he purchased dinner

for her. En route to the restaurant, [Sowell] smoked the second marijuana cigarette, having consumed the first at Graham's residence. Thereafter the pair made their way to a hotel where [Sowell] rented a room. There was conflicting testimony concerning the events that transpired thereafter. However, it is not disputed that [Sowell] eventually lost consciousness, having consumed an unspecified quantity of wine during the evening in addition to the marijuana. The next morning [Sowell] made his way back to his residence, stopping along his route to obtain breakfast for Billups.

[Sowell] next encountered Billups on the afternoon of May 4, 1983. Billups was in the company of Edwards and the trio passed in the doorway of a store but did not acknowledge one another. As will be seen, this seemingly inconsequential meeting gained significance later in the day.

That evening [Sowell] returned to his apartment building after, according to his testimony, visiting no less than five taverns and consuming at least one double shot of vodka at each stop. Upon returning to his apartment building [Sowell] realized that he was not in the mood to retire for the evening, and instead presented himself at Graham's apartment. Graham greeted [Sowell] and invited him inside, where Edwards and Billups were also present. Graham produced a marijuana cigarette which was consumed by all four occupants.

[Sowell] testified before the trial court that following the consumption of the marijuana, he fell asleep for a short time. When he awoke the others were still present and [Sowell] discovered that approximately $190 had been removed from his trouser pocket. At first [Sowell] thought that the trio was playing a joke upon him; however, his requests for the return of his money received no response. [Sowell] further testified that Graham then picked up a knife and ordered [Sowell] to leave the residence. [Sowell] complied and departed, but he was extremely angry as a result of his loss.

Both Billups and Edwards told the trial court that [Sowell's] visit to the apartment on the day in question was at first friendly. However, [Sowell] soon became agitated and accused Billups of being unsociable in that she did not speak to him earlier that afternoon. [Sowell] also accused Billups of stealing $24 from him during their encounter three days earlier. When [Sowell] referred to Billups in terms meant to insult her pedigree, Graham ordered [Sowell] to leave the premises. [Sowell] left, stating that he was going to obtain his gun, return and shoot Billups.

[Sowell] went directly to his apartment where he directed his common-law wife, Lenora Waugh (Waugh), to bring his gun to him. Waugh complied with that request, as well as with [Sowell's] instructions

to accompany him to Graham's apartment. Upon returning to Graham's door, Waugh, at [Sowell's] instruction, knocked and indicated to those inside that she was a woman named Portia. Graham responded to the door and opened it. Edwards and Billups testified, and the trial court found, that [Sowell] forced his way into the apartment, firing a bullet from his handgun into the ceiling as he entered. [Sowell] demanded to know Billups's whereabouts and threatened to shoot her. Graham was able to calm [Sowell] and began to escort him from the apartment and to close the door, whereupon [Sowell] suddenly turned and shot Graham in the abdomen. As Graham fell, [Sowell] fired a second shot into Graham's skull. Graham fell to the floor, mortally wounded.

[Sowell] next made his way to the closet in which Billups was cowering, and fired three bullets into her body. [Sowell] next placed the gun to Billups's forehead and pulled the trigger. However, the gun did not expel a bullet because it no longer contained ammunition. [Sowell] left the apartment after warning Edwards not to leave the premises or he would shoot her also. [Sowell] returned to his apartment, obtained money and made his way to a nearby tavern where he was apprehended by the police.

[Sowell] testified regarding the shootings and told the court that he returned to Graham's apartment to demand his money and that he was confronted by Graham, who was armed with a knife. [Sowell] stated that it was only after Graham made a furtive movement that [Sowell] began shooting at Graham, and that one of the bullets struck the ceiling. [Sowell] explained his conduct as follows: "It just, I just clocked out. When I seen that person going this way I just pivoted, I pivoted on my gun, I was shooting, I was angry, I started shooting, I just started shooting everybody I seen."

*State v. Sowell*, No. C-830835, 1986 WL 9082, at *1-2 (Ohio Ct. App. Aug. 20, 1986) (footnotes omitted).

Sowell was indicted on one count of aggravated murder for the shooting of Graham, and one count of attempted murder for the shooting of Billups. The aggravated murder count contained a capital specification alleging that the shooting was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons. *See* O.R.C. § 2929.04(a)(5). Relying on the advice of trial counsel, Sowell waived his right to a jury trial and opted for trial by a three-judge panel, *see* O.R.C.

§ 2945.06, which unanimously found Sowell guilty of both counts, including the capital specification.

The defense's mitigating evidence consisted of an unsworn statement by Sowell, the testimony of five witnesses who knew Sowell as an adult, and the submission of several psychological reports prepared by court-appointed mental health experts. Also before the panel was the presentence investigation (PSI) report prepared by the probation department. None of this material revealed any substantial details about Sowell's background or family history. The panel unanimously sentenced Sowell to death on the aggravated murder count, and to a term of seven to twenty-five years of imprisonment on the attempted murder count. Sowell's conviction and sentence were upheld on direct appeal and his petition for state post-conviction relief was unsuccessful at trial and on appeal.

Sowell's federal habeas petition was initially dismissed without prejudice for failure to exhaust the Ohio Supreme Court's *Murnahan* procedure for raising claims of ineffective assistance of appellate counsel. *See State v. Murnahan*, 584 N.E.2d 1204, 1209 (Ohio 1992). After the Ohio courts denied his *Murnahan* motions, Sowell renewed his federal habeas petition on May 24, 1994, raising fifty-two claims. The district court conducted an evidentiary hearing allowing Sowell to develop one of these claims—that his waiver of a jury trial was not knowing and intelligent. Our initial review of Sowell's petition reversed the district court's conditional grant of habeas relief on that claim. *Sowell v. Bradshaw*, 372 F.3d 821, 838 (6th Cir. 2004).

The district court reopened Sowell's petition on November 16, 2004, and addressed his remaining claims. In a carefully reasoned opinion, the district court found that Sowell received ineffective assistance of counsel during the penalty phase of his trial. *Sowell v. Collins*, 557 F. Supp. 2d 843 (S.D. Ohio 2008). After reviewing the mitigating evidence presented to the three-judge panel, the court compared this with the additional mitigating evidence that was submitted in Sowell's state post-conviction petition. The court noted that "virtually all of the evidence presented [at sentencing] concerned good deeds performed by petitioner during his adult life." *Id.* at 852. In

contrast, the court noted, the additional mitigating information concerned evidence that "petitioner grew up in extreme poverty and suffered severe abuse and neglect as a child." *Id.* at 852-53.

The district court found that counsel's failure to discover this entirely different category of mitigating evidence was constitutionally deficient performance. *Id.* at 866-71 (citing *Strickland v. Washington*, 466 U.S. 668, 690 (1984)). Counsel did not perform an adequate sentencing-phase investigation, the court reasoned, because they "fail[ed] to interview members of petitioner's family" and "ignored known leads that might have helped them to prepare their case in mitigation." *Id.* at 870-71. The district court found that Sowell was prejudiced by his attorneys' performance because "a reasonable probability exists that the outcome would have been different had more detailed information been presented regarding petitioner's tragic childhood and social development." *Id.* at 871. The court rejected the argument that this evidence was "merely cumulative of information that was presented" in the written reports of the court-appointed experts, because the new information was "significant," "qualitatively different," and "would have painted an entirely different portrait" of Sowell. *Id.* at 872. The court granted a conditional writ on Sowell's ineffective-assistance claim and denied relief on all of the remaining grounds.

The Government appeals the district court's conditional grant of habeas relief on the ineffective-assistance claim. Sowell cross-appeals, challenging the district court's dismissal of five of his claims: (1) ineffective assistance of counsel during the trial's guilt phase; (2) violation of Sowell's due process rights based on an ex parte meeting between the presiding judge and members of the probation department; (3) certain alleged sentencing errors; (4) insufficient evidence to support his convictions; and (5) suppression of exculpatory evidence by the prosecution. For substantially the reasons set out by the district court, the grant of a conditional writ on the claim that counsel were ineffective during the penalty-phase proceeding was proper, and Sowell's remaining grounds for habeas relief are without merit.

II.

This case is not governed by the strict limits on federal habeas review imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Because Sowell filed his habeas petition in 1994, the pre-AEDPA standard of review applies. *Sowell*, 372 F.3d at 828. Under this standard, a state court's factual findings are entitled to a presumption of correctness that is rebuttable by convincing evidence, *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), while the state court's determination of questions of federal law or mixed questions of federal law and fact are reviewed de novo, *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001). The pre-AEDPA standard of review "entitle[s] [Sowell] to have the federal habeas court make its own independent determination of his federal claim, without being bound by the determination on the merits of that claim reached in the state proceedings." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

*A. Ineffective Assistance of Counsel During the Penalty Phase*

Application of this standard leads to the conclusion that Sowell received ineffective assistance during the penalty phase of his capital trial. Trial counsel failed to uncover and present evidence of Sowell's deprived and abusive childhood, which left the sentencing panel unaware of a substantial body of mitigating evidence that could have led at least one of the judges to vote against the death penalty. Because we uphold the district court's determination that counsel's failure to conduct an adequate sentencing-phase investigation fell short of constitutional standards, it is not necessary to address Sowell's other arguments that his counsel's performance during the penalty phase was deficient.

1. Deficient performance

Sowell's attorneys performed deficiently because they did not interview Sowell's family members or investigate references to his horrific childhood contained in the reports of court-appointed mental health experts. Counsel's failure to interview Sowell's family was inconsistent with their obligation to conduct a thorough sentencing-phase

investigation, *see Porter v. McCollum*, 130 S. Ct. 447, 453 (2009) (per curiam), and was unreasonable in light of the "leads" contained in the experts' reports, which should have prompted counsel to investigate further, *see Wiggins v. Smith*, 539 U.S. 510, 534 (2003). Because they were not aware of this additional mitigating evidence, Sowell's attorneys were not in a position to make a conscious, strategic decision about the type of mitigation case to present at sentencing.

Counsel's mitigation strategy at sentencing was to present Sowell as a good person who lost his temper because he felt betrayed by his friend Graham. The mitigation evidence consisted of Sowell's unsworn statement, the testimony of five witnesses—Lenora Waugh, two probation officers, and two work colleagues—who knew Sowell as an adult, and the submission of several competency and capacity evaluations. As the district court noted, almost all of the testimony involved good deeds Sowell had done as an adult. *Sowell*, 557 F. Supp. 2d at 852. The witnesses gave specific examples of times when Sowell had helped them in need and had attempted to prevent crimes in his community. They testified that Sowell was kind-hearted, trustworthy, a hard worker, and a good father. The psychological reports likewise described Sowell as "a most righteous man with a high moral sense" who was "proud of his good works." But their discussion of Sowell's background was perfunctory, and none of the witnesses shed any light on Sowell's childhood or family history. Direct examination of the six witnesses totaled only thirty-four pages of transcript. Counsel failed to call any family members to testify, and the panel did not learn anything substantial about Sowell's formative years.

There is nothing wrong with a mitigation strategy that emphasizes a capital defendant's redeeming qualities. But Sowell's attorneys did not make a conscious choice among available alternative strategies because they overlooked an entire category of compelling mitigating evidence—evidence that might have caused the sentencing panel to rethink its assessment of Sowell's moral culpability. Counsel's failure to present evidence of Sowell's horrific childhood resulted from their ignorance of this evidence, not from an informed choice between mutually exclusive mitigation theories.

Sowell's attorneys failed to uncover this additional mitigating evidence—and therefore performed deficiently—for two reasons.

First, counsel did not interview any of Sowell's family members, including his father, brothers, sisters, and other relatives. Affidavits of fourteen family members and friends accompanied Sowell's state post-conviction petition, recounting the violence and privation of Sowell's childhood. Many of these witnesses stated that they would have been available and willing to testify at the penalty phase but had not been asked to do so. Sowell's attorneys did not contact a single member of his immediate family, and only Sowell's father spoke with the social worker who compiled information for the psychological evaluations.

Counsel's failure to interview Sowell's family fell short of the "reasonable" investigation required by the Sixth Amendment, as well as the then-prevailing standards "articulated by the American Bar Association (ABA)—standards to which we long have referred as 'guides to determining what is reasonable.'" *Wiggins*, 539 U.S. at 524 (quoting *Strickland*, 466 U.S. at 688)). As in *Porter*, "[i]t is unquestioned that under the prevailing professional norms at the time of [defendant's] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" 130 S. Ct. at 452 (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). These standards required counsel to make efforts to "'explore all avenues leading to facts relevant to . . . the penalty in the event of conviction,'" including evidence of Sowell's "'background, education, . . . family relationships, and the like.'" *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009) (quoting 1 ABA Standards for Criminal Justice 4-4.1, at 4-53 (2d ed. 1980)). In choosing not to interview Sowell's family members, his attorneys failed in their obligation to conduct a "thorough" investigation.

Of course, these professional standards did not require Sowell's attorneys to contact every person who ever knew Sowell during every period of his life, and "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Van Hook*, 130 S. Ct. at 19 (2009). But Sowell's attorneys stopped well short of that point.

While there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation," *Wiggins*, 539 U.S. at 528 (quoting *Strickland*, 466 U.S. at 690-91). An attorney does not make a strategic decision by choosing to ignore a body of evidence, the contents of which are unknown. That is not strategy.

Because counsel did not interview Sowell's family members, the panel did not learn that Sowell's early life was abusive, impoverished, and totally chaotic. The affidavits of Sowell's father, brothers, sisters, and family friends describe in vivid detail the physical and psychological abuse Sowell endured as a child. Sowell's father was a serious alcoholic who beat his wife and children on a regular basis. His father was frequently absent for long periods of time, but when he was home, the family lived in terror. To avoid setting off a drunken outburst, Sowell and his siblings would not speak while their father was home. Sowell's mother was only 15 years old when she got married. She lacked basic parenting skills and vocally wished her children were dead or had never been born. She was petrified of Sowell's father and would not defend the children from his drunken beatings. To escape the domestic violence, she often fled the home, leaving the children without supervision for days at a time. Sowell's parents eventually divorced, but Sowell and his siblings remained with their father. The abuse continued into Sowell's adolescent years. On one occasion, Sowell's father tied him and his sister JoAnn to a chair and beat them until a neighbor intervened. Sowell's father also sexually molested Sowell's sister Catherine and threatened to pour gasoline over her and watch her burn if she reported it.

The affidavits also paint a picture of extreme poverty. The panel did not learn, for example, that Sowell's infant brother died of starvation and that Sowell and his siblings had to beg for and steal food. The children were bitten by rats, infected with worms, and lacked sufficient clothing and shoes. The entire family—all six children—lived in a small trailer and later moved into an unfinished basement that

lacked electricity or running water. By the time Sowell was fourteen, he was living in a junkyard, on his own, in a tent. None of Sowell's siblings has fared any better in life. JoAnn became a prostitute and killed her pimp. She died a week before the murder in this case. Larry Sowell shot his brother Benny and served time for manslaughter. Benny and Henderson Sowell, Jr. were both incarcerated for burglary. Four of the five children who survived were alcohol or drug addicts. "[A] competent attorney, aware of this history, would have introduced it at sentencing," *Wiggins*, 539 U.S. at 535, and counsel's failure to do so here was deficient.

Second, counsel failed to uncover compelling evidence of Sowell's background because they did not follow up on the obvious leads contained in the written reports of court-appointed experts. "In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. The question is "whether counsel adequately followed up on the 'leads' that were available to them," *Haliym v. Mitchell*, 492 F.3d 680, 712 (6th Cir. 2007), or whether counsel instead "abandon[ed] their investigation at an unreasonable juncture," *Wiggins*, 539 U.S. at 527. Our decision in *Harries v. Bell*, 417 F.3d 631 (6th Cir. 2005), illustrates the point. In that case, we held that interviews conducted by counsel "produced viable leads regarding Harries's poor mental health and troubled family background," and held that "[c]ounsel's failure to follow these promising leads . . . was deficient." *Id.* at 639.

Here, the psychological reports would have prompted a reasonable attorney to expand the investigation beyond the redeeming aspects of Sowell's adult life. The district court summarized the indications of Sowell's troubled childhood in these reports as follows:

> Dr. [Nancy] Schmidtgoessling's mitigation report noted that petitioner had a "rough childhood" and "an unhappy home life." She reported that petitioner experienced a "lack of adequate food, clothing and material goods as well as [a] lack of close parental nurturance." According to her report, petitioner felt "abandoned, angry, without significant stable relationships, and conscious of the need to defend himself in a dangerous,

hostile environment." She relayed that petitioner was "on his own" at a young age, that he skipped school, and that he ran away for days at a time. Dr. Schmidtgoessling noted petitioner's history of depression and alcohol abuse. Likewise, Dr. [James] Titchener reported that petitioner's mother was distant, that she frequently left her family, and that her abandonment was responsible for much of the anger and hostility petitioner experienced. Dr. [William] Walters noted that petitioner's father was a "strict disciplinarian" and that the Sowell family was very poor. Walters, Schmidtgoessling, Titchener and [Dr. Emmett] Cooper all noted that alcohol and marijuana use contributed to that events leading up to the murder.

*Sowell*, 557 F. Supp. 2d at 869. These hints of a childhood filled with privation and abuse should have moved Sowell's attorneys to expand the scope of their investigation. Instead, Sowell's attorneys "ignored pertinent avenues for investigation of which [they] should have been aware." *Porter*, 130 S. Ct. at 453.

The Supreme Court's decision in *Wiggins* strongly supports the district court's conclusion that counsel performed deficiently in failing to follow up on these leads. In *Wiggins*, counsel abandoned their investigation of Wiggins' background "after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. The PSI report and Department of Social Services (DSS) records that counsel obtained revealed that Wiggins' mother was a chronic alcoholic; that Wiggins was "shuttled from foster home to foster home and displayed some emotional difficulties" while there; that he had "frequent, lengthy absences" from school; and that, "on at least one occasion, his mother left him and his siblings alone for days without food." *Id.* at 525. Despite these promising leads, counsel did not investigate further. The Supreme Court held that "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.* at 525. "Counsel's decision not to expand their investigation beyond the PSI and DSS records" was "unreasonable in light of what counsel actually discovered in the DSS records." *Id.* at 524.

More recently in *Porter*, 130 S. Ct. at 453, the Supreme Court held that counsel's failure to interview the defendant's family members and obtain school, medical, or

military service records was constitutionally deficient. *Id.* Like the counsel in *Wiggins*, Porter's attorney did not follow up on leads contained in court-ordered competency evaluations, which "collectively reported Porter's very few years of regular school, his military service and wounds sustained in combat, and his father's 'over-discipline[e].'" *Id.* This court has also recently found deficient performance where defense counsel did not follow up on leads developed from a narrow set of sources. *Goodwin v. Johnson*, 632 F.3d 301 (6th Cir. 2011). In that case, defense counsel interviewed some of Goodwin's family members, but did not contact his mother, sister, neighbors and friends, or the mother of Goodwin's child. We held that "[t]he information Goodwin's counsel possessed, obviously incomplete, should have triggered a more thorough investigation of Goodwin's past." *Id.* at 324.

As the district court recognized, "[t]his is not a case where counsel presented absolutely no evidence in mitigation." *Sowell*, 557 F. Supp. 2d at 871. The evidence counsel did present was intended to draw out the redeeming qualities that made Sowell's life worth sparing. But counsel's decision to emphasize Sowell's worthwhile adult life while leaving out his horrific childhood is not easily considered a reasonable mitigation strategy, particularly where the additional evidence would not have been inconsistent with—and might even have strengthened—the mitigation case counsel did present. "The evidence concerning petitioner's horrific upbringing that counsel failed to present would have bolstered their mitigation case by demonstrating that petitioner was capable of generosity and good acts in spite of the upbringing that he endured." *Id.* at 872. This case is therefore different from *Sears v. Upton*, 130 S. Ct. 3259, 3261-62 (2010) (per curiam), where counsel's mitigation strategy of emphasizing Sears' "stable, loving," and "privileged" childhood backfired when the prosecutor used this evidence to argue that Sears was even more culpable than he would have been had he grown up as a "deprived child from the inner city . . . who[m] society ha[d] turned its back on at an early age."

More importantly, even if a decision to "emphasize the good rather than the bad" were a reasonable mitigation strategy in the abstract, *Sowell*, 557 F. Supp. 2d at 871, it was not reasonable in this case because counsel were not fully aware of their options.

The Supreme Court has found deficient performance even in "cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase." *Sears*, 130 S. Ct. at 3266. Thus, notwithstanding the mitigation case counsel did present, our "principal concern in deciding whether counsel exercised reasonable professional judgment is whether the investigation supporting counsel's decision not to introduce mitigation evidence of [defendant's] background *was itself reasonable*." *Wiggins,* 539 U.S. at 523 (emphasis in original). In this case, as in *Wiggins*, "counsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable." *Id.* at 536.

As the district court explained, this is also not a case where counsel could have legitimately feared that digging deeper into Sowell's past would turn up evidence that was more damaging than favorable. *Sowell*, 557 F. Supp. 2d at 873. Sowell's entire criminal record and arrest history were included in the PSI report and the mental health evaluations that were submitted to the panel at sentencing. The psychological reports also thoroughly documented Sowell's short temper and his propensity for responding violently to perceived injustices, especially when drinking. Thus, the panel already knew the worst. Further investigation could only have helped Sowell. This case therefore differs from *Wood v. Allen*, 130 S. Ct. 841, 847-49 (2010), where counsel had made a strategic decision not to investigate Wood's mental deficiencies, despite having available a favorable expert report on the matter, because the report also contained details about Wood's 19 earlier arrests and his attempt to murder a prior ex-girlfriend—rebuttal evidence that counsel had been successful in excluding at trial. *Id.* at 850 n.3. Sowell's case is also different from *Burger v. Kemp*, 483 U.S. 776, 794 (1987), in which a limited investigation was reasonable because all potential witnesses interviewed by counsel provided information that was more harmful than helpful. Without knowledge of the mitigating side of Sowell's background, his attorneys could not have made a conscious, strategic judgment that this evidence would do more harm than good.

## 2. Prejudice

Turning to the second prong of *Strickland*, Sowell was prejudiced by his attorneys' performance because, as the district court found, "there is a reasonable likelihood that at least one member of the three-judge panel would have voted in favor of a sentence less than death if the panel had been informed of Sowell's dysfunctional childhood." *Sowell*, 557 F.3d at 866. The additional mitigating evidence differs in strength and in subject matter from the evidence the panel heard, and the evidence is therefore not cumulative. And far from being inconsistent with counsel's mitigation strategy, the information concerning Sowell's background would have strengthened counsel's mitigation theory that Sowell was a good person because it was highly relevant to any assessment of his moral worth.

To establish prejudice, Sowell must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. Thus, in a capital case, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Additional mitigating evidence that is "merely cumulative" of that already presented does not undermine the results of sentencing. *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006). Instead, "the new evidence . . . must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Tibbetts v. Bradshaw*, 633 F.3d 436, 444 (6th Cir. 2011) (internal quotations omitted).

Here, the additional mitigating evidence is sufficient to "undermine confidence in the outcome" of Sowell's sentencing proceeding. *See Strickland*, 466 U.S. at 694. As in *Williams*, 529 U.S. at 398, "the graphic description of [defendant's] childhood, filled with abuse and privation, . . . might well have influenced the [panel's] appraisal

of his moral culpability." Though the mitigating evidence regarding Sowell's childhood is extensive, the panel heard only about Sowell's adult life. The testimony at sentencing supports counsel's theory that Sowell's life had residual value. But what is key to the prejudice inquiry is the evidence the panel did *not* hear—specific details about Sowell's "nightmarish" childhood. *See id.* at 395.

This evidence is not merely cumulative. There is no question that the additional mitigating evidence is stronger than anything the panel learned about Sowell's background from the written reports of Drs. Schmidtgoessling, Titchener, and Walters. These reports spoke in generalities that lacked any details of the severe abuse and abject poverty Sowell experienced as a child, or any "graphic descriptions" of the atmosphere of violence that permeated his formative years. *See id.* at 398. In contrast, Sowell's family members offered first-hand, eyewitness accounts of specific examples of extreme poverty and abuse. These specifics had far more evidentiary power than the abstractions and oblique references contained in the experts' written reports.

What is more, the experts themselves never heard any of these details when they conducted their evaluations. Drs. Schmidtgoessling, Titchener, and Cooper interviewed only Sowell and had no contact with his family members. Only the social worker who compiled information for Dr. Walters' pretrial examination had any contact with Sowell's family, and she spoke only with Sowell's father—a source who had good reason to withhold the most compelling examples of abuse Sowell and his siblings endured as children. The reports of Drs. Titchener and Walters were not prepared for mitigation purposes, and there is nothing in Dr. Cooper's report about Sowell's background. These experts were appointed to evaluate Sowell's competence to stand trial and his mental capacity for purposes of exploring an insanity defense, and to the extent their reports discuss Sowell's background at all, they are drawn from an even narrower set of sources than those available to defense counsel.

The subject matter of the additional mitigating evidence is different as well. The good deeds Sowell had done as an adult provide an incomplete picture of his moral worth. Sowell's actions as an adult—good and bad—are merely a snapshot in time,

unilluminated by the longitudinal perspective that his developmental history provides. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotations omitted). Moreover, Sowell's good deeds might have been written off as isolated incidents or attributed to ulterior motives by a sentencing judge disinclined to see Sowell as a basically good person. But the additional mitigating evidence is of more than a few scattered incidents. It is evidence of a lifetime of privation and abuse, beginning in early childhood and continuing throughout the formative years of Sowell's life.

The evidence the panel did not hear—specific details about Sowell's horrific childhood—is often the kind of evidence that undermines a court's confidence in the outcome of a capital sentencing proceeding. In *Williams*, 529 U.S. at 395, the Supreme Court found prejudice where counsel failed to present evidence that Williams had a "nightmarish" childhood, that his "parents were imprisoned for the criminal neglect" of their children, and that Williams "had been severely and repeatedly beaten by his father." Similarly in *Wiggins*, 539 U.S. at 535, the Court found prejudice where counsel failed to discover "powerful" evidence of "severe privation and abuse in the first six years of [Wiggins'] life while in the custody of his alcoholic, absentee mother," as well as evidence of "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." Again in *Rompilla v. Beard*, 545 U.S. 374, 392-93 (2005), the Court found prejudice where counsel failed to present evidence that Rompilla was reared in abject poverty and suffered extreme physical and psychological abuse, which included being "locked . . . [with] his brother Richard in a small wire mesh dog pen that was filthy and excrement filled." And in *Porter*, 130 S. Ct. at 449, the Court found prejudicial counsel's failure to present evidence of Porter's "abusive childhood" and "horrible family life," including an incident in which "Porter's father shot at him for coming home late, but missed and just beat Porter instead," and another in which Porter's mother was beaten "so severely that she had to go to the hospital and lost a child." Most recently in *Sears*, 130 S. Ct. at 3262, the Court found prejudicial counsel's

failure to present evidence that Sears' home life was "physically abusive" and that he "suffered sexual abuse at the hands of an adolescent male cousin."

A finding that Sowell was prejudiced by his attorneys' failure to develop and present exactly this kind of mitigating evidence is therefore squarely in line with the Supreme Court decisions addressing ineffective assistance during the penalty phase of a capital trial.  Our court has also repeatedly found that ignorance of specifics about a defendant's formative years undermines confidence in the outcome of a capital sentencing proceeding.  Most recently in *Goodwin*, 632 F.3d at 329, we deemed prejudicial counsel's failure to present evidence that Goodwin suffered "severe privation and abuse in the early years of his life and while in the custody of his alcoholic and drug using mother," including evidence that he was "frequently beaten, sexually molested, and abandoned by both of his parents."  Likewise in *Mason v. Mitchell*, 543 F.3d 766, 780 (6th Cir. 2008), this court held that the petitioner was prejudiced where counsel did not present evidence of Mason's "abusive and unhealthy" childhood, including evidence that his parents were "daily drug users as well as traffickers," that his mother "shot at his father because of his involvement with prostitution," and that Mason's parents "regularly abused Mason and isolated all of their children from anyone not associated with the parents' drug dealing activities."  And in *Harries*, 417 F.3d at 639, we upheld the district court's finding of prejudice where counsel failed to discover evidence that Harries suffered "significant physical abuse" during his "traumatic" childhood, including an incident in which he was "hit . . . on the head with a frying pan," and another in which he was "choked so severely that his eyes hemorrhaged."

In short, like the additional mitigating evidence presented in these cases, evidence of Sowell's severely impoverished and abusive childhood is not merely cumulative of that presented at sentencing.  This is also not a case in which the omitted evidence "would have triggered admission of . . . powerful [aggravating] evidence in rebuttal."  *Wong v. Belmontes*, 130 S. Ct. 383, 387-88 (2009) (per curiam).  In *Belmontes*, defense counsel "built his mitigation strategy around the overriding need to exclude" evidence that Belmontes had committed a prior murder.  *Id.* at 385.  The

Supreme Court held that counsel's decision not to use expert testimony to "humanize" Belmontes was not prejudicial, because the expert testimony would have opened the door to evidence of the prior murder kept out only by counsel's vigilance. *Id.* at 388; *see also Wood*, 130 S. Ct. at 850 n.3. Here, the panel already knew the most damaging information about Sowell's background from the PSI and psychological reports, and additional mitigating evidence could only have tipped the balance in favor of leniency.

We recognize that the prejudice question in this case is close, and that the Ohio courts had a different view of the impact defense counsel's performance had on Sowell's sentencing proceeding. However, under the pre-AEDPA standard that applies to this case, the federal courts must make their "own independent determination of [Sowell's] federal claim," and are not bound by the state courts' view. *Wainwright*, 433 U.S. at 87. For these reasons, the district court properly found that there is a reasonable probability that a three-judge panel presented with evidence of Sowell's extensive abuse and neglect would have returned a different sentence.

Accordingly, Sowell is entitled to relief on his claim that trial counsel provided ineffective assistance during the penalty phase of his capital trial. Because counsel's failure to investigate compelling mitigating evidence constitutes ineffective assistance warranting resentencing, it is not necessary to address the other sentencing issues raised in the habeas petition concerning the imposition of the death penalty, including whether counsel's failure to obtain "reasonable and necessary" experts constitutes ineffective assistance, whether the three-judge panel erred in applying the wrong weighing standard during sentencing, and whether the presiding judge's ex parte communication with the probation department rendered the death sentence constitutionally infirm.[1] We now turn to issues raised by Sowell concerning the guilt phase of his trial.

---

[1]To the extent that this claim can be read as a challenge not only to Sowell's sentence but also to his conviction, we reject it for the reasons given by the district court. *Sowell*, 557 F.3d at 893-97.

III.

*A. Prosecution's Suppression of Exculpatory Evidence*

Sowell claims that the prosecution failed to disclose material exculpatory evidence, as required by *Brady v. Maryland*, 373 U.S. 83 (1963). This claim is without merit for the reasons given by the district court. *Sowell*, 557 F. Supp. 2d at 907-09. Sowell argues that prosecutors suppressed the statement of Jerrell Perrin, an eyewitness who lived on the same floor of the apartment building as Sowell and Graham. But Perrin's statement is not material and does not create sufficient doubt as to Sowell's guilt.

In her affidavit filed in the post-conviction proceeding, Perrin testified that on the night of the shooting, she saw Sowell standing outside Graham's apartment and heard him ask Pamela Billups to return his money, and that she heard Billups respond by screaming profanities at Sowell. She testified that between twenty and thirty minutes later, she heard what she thought was a car backfiring. When she opened her door, she saw Sowell walking back to his apartment. Perrin testified that she knew Billups was a prostitute and had a reputation for dishonesty, and that Billups was known for stealing money from her customers.

As the district court explained:

> Perrin's affidavit actually contradicts petitioner's trial testimony, and the defense theory of the case, in several key respects. Petitioner testified that he did not argue with Billups about his money, yet Perrin's statement quite clearly states that she heard petitioner and Billups arguing. More importantly, Perrin's affidavit states that she heard the sounds of gunfire twenty to thirty minutes after the argument. This statement directly contradicts petitioner's testimony that the shooting happened "far less than five minutes" after he left the apartment, and calls into question the defense theory that this offense was committed without sufficient time to form the intent necessary for prior calculation and design.

*Sowell*, 557 F. Supp. 2d at 908-09. There is therefore not a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have

been different," *Strickler v. Greene*, 527 U.S. 263, 280 (1999), and Sowell's *Brady* claim therefore fails.

### *B. Sufficiency of the Evidence of Aggravated Murder*

Sowell next argues that there was insufficient evidence to support his conviction. He is wrong. Sowell was convicted of aggravated murder, which requires a finding of prior calculation and design. *See* O.R.C. § 2903.03(A)(1). We adopt the careful reasoning of the district court to the effect that the evidence presented at trial was sufficient to prove beyond a reasonable doubt that Sowell acted with prior calculation and design. Most pointedly, the district court explained that:

> [T]he shootings did not occur as a result of an instantaneous eruption or one continuous course of events. There was an initial encounter and an exchange of hostile words between petitioner and Billups that generated a decision on petitioner's part to shoot and kill Billups. After arguing with Billups about whether she had taken his money, petitioner announced his intention to get his gun and kill Billups, and he put into action a plan to achieve that result. To that end, petitioner left Graham's apartment, went down the hall to his own apartment, and retrieved his gun. Although the period of time that elapsed between the initial encounter and the shootings was brief, there was a break in the encounter, or an intervening period, during which there was a time for reflection and planning. During that time, petitioner retrieved his weapon from a different location and devised a plan to regain entry to Graham's apartment under false pretenses by using Lenora Waugh. Accordingly, . . . there was sufficient time, under all of the circumstances, for petitioner to plan the killing.

*Sowell*, 557 F. Supp. 2d at 917.

### *C. Ineffective Assistance of Counsel During the Guilt Phase*

Finally, Sowell asserts that he received ineffective assistance of counsel during the guilt phase of his trial for four reasons. First, Sowell argues that counsel failed to conduct a reasonable pretrial investigation by not interviewing the state's witnesses. Second, Sowell argues that counsel failed to call Sowell's neighbor, Jarrell Perrin, as a defense witness. Third, Sowell argues that counsel failed to cross-examine Donna Edwards, a key prosecution witness and eyewitness to the shootings. And fourth, Sowell

claims that counsel failed to object to inadmissible evidence concerning Sowell's children, a false ceiling in his apartment, and his prior contacts with law enforcement. With respect to each of these arguments, counsel's performance was not deficient, or if it was, Sowell has not shown that the deficiency affected the outcome of his trial.

### 1. Counsel's failure to conduct a reasonable investigation

Sowell first argues that his attorneys did not conduct a sufficient pretrial investigation because they failed to interview the state's witnesses. Again, we adopt the reasoning of the district court, which carefully disposed of this argument, relying in part on the fact that:

> [T]he record reflects that counsel filed for discovery and for a more definite bill of particulars, met with petitioner to discuss his options with respect to the trier of fact, and reviewed the grand jury testimony of at least four witnesses. During a pre-trial hearing, petitioner's counsel stated on the record that they had met with the prosecutor and reviewed the evidence and photographs. Counsel filed several pre-trial motions, including a motion to suppress the gun found in petitioner's apartment. Moreover, as the trial court noted, petitioner failed to present any evidence during his post-conviction proceedings suggesting that his counsel did not have copies of the witness statements to police.

*Sowell*, 557 F. Supp. 2d at 883 (citations omitted).

Sowell cites the Seventh Circuit's holding in *Stanley v. Bartley*, 465 F.3d 810, 813 (7th Cir. 2006), for the proposition that these activities were not enough. But unlike the defendant in *Stanley*, Sowell was not prejudiced by his attorneys' failure to interview the state's witnesses because he has shown no real way in which their testimony would indicate his innocence. In *Stanley*, the state's key witness, James Dean, who might well have been the murderer, testified that he was with Stanley on the night of the murder and that he saw Stanley shoot the victim in the back. *Id.* at 811. But other witnesses—who did not testify and whom defense counsel did not interview—told the police that Dean and the victim had been involved in a violent quarrel hours before the shooting. *Id.* at 812. Here, Sowell admitted shooting Graham and Billups, and the only issue to be decided by the panel was whether Sowell had committed the acts with prior calculation

and design.  Sowell has presented no evidence that would undermine confidence in the panel's finding of prior calculation and design.  Thus, no prejudice has been shown from counsel's performance in this regard.

### 2. Counsel's failure to call Jerrell Perrin

Sowell next argues that counsel failed to call Sowell's neighbor Perrin as a defense witness.  The district court rejected this argument for the same reason it found that Perrin's statement was not material exculpatory evidence—i.e., "the Perrin affidavit supports, in many respects, the state's theory of the case, and contradicts petitioner's account of the events." *Sowell*, 557 F. Supp. 2d at 884.  The court therefore properly concluded that "the testimony of Perrin . . . would not have affected the outcome of petitioner's trial." *Id.* at 885.

### 3. Counsel's failure to cross-examine Donna Edwards

The district court's opinion also properly disposes of Sowell's argument that trial counsel performed deficiently by failing to cross-examine Donna Edwards, a key prosecution witness and eyewitness to the shooting.  Sowell maintains that the testimony of Edwards—the only individual present in the apartment who was not shot by Sowell—was inconsistent in several respects with Billups's testimony, and that counsel should have brought out these inconsistencies on cross-examination.  But once again, Sowell has not established that he was prejudiced by counsel's failure to do this.

With respect to counsel's performance, the district court explained:

> Although Edwards was a witness to the actual shooting, she had little to offer regarding petitioner's interaction with Billups in the days immediately preceding the shooting.  Billups, on the other hand, was subject to lengthy cross-examination by counsel, as counsel attempted to establish that the shootings "were prefaced by a heated, passionate, and emotional exchange between Mr. Sowell and Ms. Billups."  Petitioner's case was not won or lost by whether counsel could exonerate him as the shooter; rather, counsel's theory of the case was that petitioner did not act with prior calculation and design, and "[t]he disputed issue centered on what precipitated the shooting."  To that end, counsel delivered an opening statement setting forth a cohesive defense, cross-examined

> Billups regarding the alleged theft that was at the center of the dispute, and called petitioner to testify regarding the events in question, his relationship with Billups in the days leading up to the shooting, and his mental state at the time of the offense.

*Sowell*, 557 F. Supp. 2d at 886-87 (citations omitted).

The district court also properly reasoned that there was no prejudice in this regard:

> Even if counsel would have highlighted the inconsistencies between Edwards' testimony and that of Billups, those inconsistencies concerned somewhat collateral matters. What remains consistent with respect to the testimony of the two women is that petitioner threatened to shoot Billups, left the apartment to retrieve a gun from his own apartment down the hall, enlisted the assistance of Lenora Waugh to regain entry into the apartment, entered the apartment with force, shot Graham twice—including a fatal close range shot to his head, then went to where Billups was hiding in a closet and fired three shots into her body at close range, stopping only when he ran out of ammunition. With respect to these essential facts, the testimony of Edwards and Billups was consistent, and petitioner cannot meet the prejudice prong of *Strickland*.

*Id.* at 887.

### 4. Counsel's failure to object to inadmissible evidence

Finally, Sowell argues that trial counsel's performance was deficient because counsel failed to object to inadmissible evidence. Sowell claims that counsel failed to object to questions by the prosecutor during Sowell's cross-examination concerning whether he conceived children out of wedlock, whether he had a false ceiling in his apartment, and whether he had prior contacts with the Cincinnati Police Department. The district court properly held that these claims were procedurally defaulted because they were never presented to the state courts. *Sowell*, 557 F. Supp. 2d at 888. The state maintains that position on appeal, and Sowell does not respond to the procedural default argument.

IV.

For these reasons, the judgment of the district court is affirmed.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

ALICE M. BATCHELDER, Chief Judge, concurring in part and dissenting in part. I agree that the district court did not err in denying habeas relief on nearly all of Sowell's claims. However, I must respectfully dissent from the portion of the majority opinion affirming the grant of habeas relief on the basis of ineffective assistance of counsel at the penalty phase. On the record before us, we cannot say either that counsel failed to investigate sufficiently, or that counsel pursued a constitutionally deficient mitigation strategy. Sowell has presented fourteen affidavits of family and friends, setting forth testimony about his childhood, his family dynamics, his work history, and his adult life. However, only one of those affidavits—that of Sowell's father—is of any help to Sowell's case, and even then, only marginally so.

Sowell's argument is that counsel did not adequately investigate and therefore could not have made a strategic decision to omit certain mitigating evidence at the sentencing phase. In these types of cases, it is obviously not enough to merely present an affidavit containing testimony that was not introduced during the penalty phase. The testimony must also be useful. *See Brooks v. Bagley*, 513 F.3d 618, 630 (6th Cir. 2008) (rejecting probative value of affidavit that did not specify what new information witnesses would have provided); *Martin v. Mitchell*, 280 F.3d 594, 614 (6th Cir. 2002) (finding no prejudice where "affidavits of [petitioner's] family members state their willingness to testify at his sentencing but do not show what mitigating evidence would have been presented had they testified"); *see also Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("[T]he new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing."). The affidavit must state that the affiant would have been willing to testify, because otherwise the trial court would never hear the relevant testimony. *See Turner v. Romanowski*, No. 07-2352, 2011 WL 383014, at *6 (6th Cir. Feb. 8, 2011) ("Turner has not produced an affidavit from Ms. Matthews herself indicating that she

would be willing to testify on Turner's behalf . . . ."); *Coe v. Bell*, 161 F.3d 320, 342 (6th Cir. 1998) (rejecting ineffective assistance claim where "most . . . witnesses were unavailable or would not cooperate with counsel at the time of pre-trial preparation"). And to show that counsel conducted an inadequate investigation, the affidavit must at least state that counsel never spoke with the affiant. *Cf. Goodwin v. Johnson*, 632 F.3d 301, 324 (6th Cir. 2011) ("The rest of Goodwin's family—including his mother, his sister, his neighbor, his friend, and the mother of his child—testified that at no time during the trial did attorneys or investigators try to contact them or ask them to testify on Goodwin's behalf."); *Morales v. Mitchell*, 507 F.3d 916, 932 (6th Cir. 2007) (affiants stated that they would have been willing to testify but counsel never contacted them). Without the affiant's stating that he had not been contacted by counsel, we have no way of knowing if the absence of the testimony was the product of an informed strategic decision by counsel or the result of deficient performance.

The majority opinion glosses over the characteristics of each individual affidavit, describing them collectively with broad, summary language: "Affidavits of fourteen family members and friends accompanied Sowell's state post-conviction petition, recounting the violence and privation of Sowell's childhood. Many of these witnesses stated that they would have been available and willing to testify at the penalty phase but had not been asked to do so." In fact, only eight of the affidavits have anything to say about Sowell's childhood. Of those, only one offers any helpful testimony and states that counsel never contacted the affiant.

In order to avoid the majority's error, I will examine the affidavits individually, not as an indistinguishable mass of potential mitigation testimony. Sowell submitted several affidavits from immediate family members: Henderson Sowell, Sr. (father); Henderson Sowell, Jr. (brother); Larry Sowell (brother); and Catherine Jones (sister). He submitted affidavits from his wife and other family members: Lenora Waugh (common law wife); Bobby Lee Horton (great uncle); Helen Sanderful (aunt); Ann Simpson (aunt). He submitted an affidavit from a childhood friend: Kenneth Starks. Lastly, he submitted affidavits from friends and acquaintances from his adult life: Adam

Huntley (employer); Leroy Jones (friend); Jerrell Perrin (neighbor); Jimmy Wilcox (co-worker); and Walter Gabennesh (employer). In all, Sowell submitted fourteen affidavits' worth of information that counsel was allegedly ineffective for failing to discover. However, very little of it goes towards establishing ineffective assistance of counsel, some of it is not helpful for mitigation, and some of it undercuts his mitigation case.

The only argument Sowell advances, and the only one that has ever gained traction in a federal court, is that counsel was ineffective for failing to investigate and present evidence concerning Sowell's difficult childhood. Therefore, any testimony presented in the fourteen affidavits regarding Sowell's adult life is not relevant to Sowell's claim. Sowell never argues to the contrary. Waugh, Huntley, Leroy Jones, Perrin, Wilcox, and Gabennesh knew Sowell only in his adult life, and their testimony does not shed light on anything new from his childhood, so those affidavits are not valuable.[1]

Of the remaining eight affiants, the only ones to actually state that Sowell's attorneys never contacted them are his father, Henderson Sowell, Sr., and his aunt, Ann Simpson. None of the others state that counsel never spoke with them.[2] In light of this, the majority opinion's statement that, "[C]ounsel did not interview any of Sowell's family members, including his father, brothers, sisters, and other relatives," is quite an overstatement.

Because the affidavits of the six other relevant affiants are silent on the matter, we cannot assume that trial counsel never spoke with them. This is simply a matter of recognizing where the burden of proof lies—with Sowell, the petitioner. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Fautenberry v. Mitchell*, 515 F.3d 614, 634 (6th Cir. 2008); *Higgins v. Renico*, 470 F.3d 624, 632 (6th Cir. 2006) ("In essence, a defendant has the burden of proving, by a preponderance of the evidence, that counsel

---

[1]Furthermore, Waugh actually did testify at the sentencing phase.

[2]Even Larry Sowell, petitioner's brother, states only that he was not asked to testify. He does not say anything about whether or not counsel ever spoke with him.

made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." (citation and internal quotation marks omitted)). The silence of the relevant affidavits on whether or not counsel ever spoke to the affiants cannot lead us to assume away Sowell's burden of proof. Furthermore, counsel's performance is entitled to "a strong presumption that [it] falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Because of this presumption, the burden of proof is heavy. *See Short v. United States*, 471 F.3d 686, 692 (6th Cir. 2006) ("[D]efendants alleging ineffective assistance of counsel bear 'a heavy burden of proof.'" (quoting *Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005))). This presumption means nothing if we automatically assume that counsel did not speak to valuable witnesses, absent evidence to the contrary. Indeed, that would be a presumption that counsel did not perform adequately.

That is especially the case here where we have no testimony, no affidavits, and no records whatsoever from the witnesses best able to speak on the extent of counsel's investigation: trial counsel themselves.[3] *See Carter v. Mitchell*, 443 F.3d 517, 531 (6th Cir. 2006) ("[C]uriously absent from the record is any statement from trial counsel describing what he did or did not do in investigating [petitioner's] background. By not detailing trial counsel's efforts to learn of [petitioner's] background, [petitioner] has provided no basis for a finding that trial counsel's investigation was unreasonable."). True, that is not always required. *See Woodard v. Mitchell*, No. 06-4329, 2010 WL 4924449, at *6 (6th Cir. Dec. 2, 2010). But it is "obvious . . . that [trial counsel's] testimony, when available, is preferred." *Id.* This Court has never held that a petitioner can establish ineffective assistance by omitting all direct evidence of counsel's investigation and presenting affidavits from persons who may or may not have been contacted by counsel, setting out their potential testimony that counsel may or may not

---

[3] It is also particularly notable that two of these affiants are willing and able to say that they were never contacted by trial counsel and would have been willing to testify if asked, e.g., Henderson Sowell, Sr. Aff., some stated only that they would have been willing to testify, e.g., Larry Sowell Aff., and others say nothing at all on the matter, e.g., Catherine Jones Aff. The most logical interpretation of the affidavits is that, astoundingly, they each mean what they say and not what they do not say.

have known.  To allow that is to do away with both the presumption that counsel performed adequately and the petitioner's burden of proof.

The Court's holding today provides a roadmap to future habeas petitioners seeking to show ineffective assistance of counsel due to inadequate mitigation investigation.  First, the petitioner should present no evidence regarding trial counsel's investigation.  Next, he should submit affidavits from people setting forth any evidence that counsel did not introduce at trial, regardless of whether or not counsel was aware of it, regardless of whether or not counsel spoke with the affiants.  Lastly, he must make sure the affiants do not mention whether or not counsel ever spoke to them during the mitigation investigation, or whether or not they were willing to testify at trial.  It is that easy.  Even if counsel did speak with the affiants but chose not to call them as witnesses, the affiants don't even have to lie about it—they just have to remain silent on the matter.

I now return to the only two possibly relevant affidavits.  Sowell's aunt, Ann Simpson, would not have provided useful testimony.  She stated in her affidavit that, "Billy Joe was a happy go lucky youth.  He was always clean and liked to dress in nice clothing."  Also undercutting the image of a chaotic and abusive relationship between his parents, she stated, "Henderson and his wife, Mary Jane, appeared to get along okay."

This leaves Sowell's father, Henderson Sowell, Sr., as the only relevant person for whom we have *any* evidence to say that Sowell's counsel never contacted him.  The testimony the father presents in his affidavit is relatively unremarkable.  Most of it concerns Henderson, Sr.'s own life and upbringing.  It mentions Henderson's alcohol use, separation of the family, and the family's impoverished housing conditions.  It does not contain any of the startling and vivid stories from Sowell's childhood:  an infant sibling dying of starvation, rats biting the children, the father's abandonment of the children, the father's beating Billy Joe until a neighbor intervened, the father's sexual molestation of Catherine, and the father's threatening to burn Catherine to death.  Those statements are from either Sowell himself (in his post-sentence interview with Dr. Hawgood) or his siblings.  Even given Henderson, Sr.'s statement that, "In 1983, I was

not contacted by Billy Joe's attorneys or their assistants," the testimony he would have offered to them was of minimal value.

Furthermore, assuming that trial counsel had all of the proffered evidence in front of him, I cannot say that their decision not to put forth testimony about Sowell's childhood was not the product of a strategic decision. I agree with the majority that the two strategies of emphasizing Sowell's deprived childhood and emphasizing his good character in his adult life are not necessarily incompatible. But as the affidavits submitted by family members make clear, the testimony about his miserable childhood would also include testimony that could harm Sowell's mitigation case. Each affidavit that included evidence about Sowell's difficult childhood also mentioned his temper and his violent tendencies. While his difficult childhood would probably paint a more sympathetic picture of Sowell, it would also paint a picture of a man inclined towards violence. The mitigation testimony of Sowell's friends that counsel did present painted a picture of a kind, generous man, with no mention whatsoever of Sowell's violent tendencies. True, the psychological reports mentioned Sowell's violent tendencies. But it could certainly have been a strategic decision by counsel to have friends give positive testimony about Sowell's character, while reserving any analysis of his violent tendencies to the expert witnesses. This would emphasize that his violent outburst that resulted in these crimes, while predictable to the experts in psychology and psychiatry, was surprising and out of character to those who knew Sowell best. Pursuing an additional strategy that focused on his difficult upbringing would not be inconsistent, but in this case it would be at great cost because it would bring to light his violent tendencies even more.

The majority dismisses this concern by employing a double standard. The majority minimizes the damaging effect of the testimony about Sowell's violent tendencies by assuring itself that the psychological reports available to the court at sentencing already "thoroughly documented Sowell's short temper and his propensity for responding violently to perceived injustices, especially when drinking." Similarly,

the psychological reports briefly documented Sowell's difficult upbringing.[4] Of course, on these matters, the majority states that testimony from family members would be far more vivid and effective at describing Sowell's difficult childhood: "These specifics had far more evidentiary power than the abstractions and oblique references contained in the experts' written reports." Why would specifics about his violent tendencies not also have "more evidentiary power"? Apparently, the advantage of specific first-hand testimony over psychological reports only works in Sowell's favor and never against it.

I dissent from the majority opinion's affirmance of the district court's grant of relief because a careful examination of the evidence before us reveals that Sowell cannot show either that his counsel undertook an inadequate investigation or that counsel's choice of mitigation strategy was unreasonable. The majority can only find grounds for relief by failing to examine the affidavits individually, presuming them all to be unequivocally relevant and helpful to Sowell, and presuming that trial counsel did *not* perform an adequate investigation. As for Sowell's other arguments for relief that the district court rejected and the majority did not need to address—that counsel should have objected to the presentence investigation report and should have obtained additional experts, challenging an ex parte communication between a trial judge and the probation department, and the trial court's weighing standard at sentencing—I would deny relief on those claims for substantially the same reasons that the district court did.

---

[4]"He describes his father as having been a strict disciplinarian . . . . The family was very poor . . . ." (Walters Report.) "Mother had been good in some ways but a distant person and one who could not be satisfied with her marriage and family and frequently left it . . . ." (Titchner Report.) "[Sowell] feels that there was a lack of close parental nurturance, thus he felt he had a 'rough' childhood . . . . [H]is early experiences left him feeling abandoned, angry, without significant stable relationships . . . ." (Schmidtgoessling Report.)